UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHIMON LAOR, MICHAEL POMPAN and MADANES INVESTMENT & ENTERPRISE LTD.,

         Plaintiffs,

-against-

FAIRFIELD GREENWICH GROUP, FAIRFIELD GREENWICH LIMITED, FAIRFIELD GREENWICH (BERMUDA) LTD., FAIRFIELD GREENWICH ADVISORS LLC, FAIRFIELD RISK SERVICES LTD., WALTER NOEL, JR., JEFFREY H. TUCKER and ANDRES PIEDRAHITA,

         Defendants.

'09 CIV 2222

INDEX NO.:



RECEIVED
MAR 10 2009
U.S.D.C. S.D.N.Y.
CASHIERS

## COMPLAINT

Plaintiffs allege, upon personal knowledge as to themselves and upon information and belief as to all other matters, as follows:

### NATURE OF ACTION

1.     This is a class action on behalf of investors in Fairfield Sentry Limited ("Fairfield Sentry" or the "Fund") seeking to recoup losses resulting from the Fund's estimated $7.5 billion in assets being almost entirely invested in a Ponzi scheme conducted by Bernard Madoff ("Madoff") and his firm Bernard L. Madoff Investment Securities ("BMIS"). As set forth herein, the Fund's Administrator, Investment Manager and Placement Agent, and their principals and related entities, improperly collected hundreds of millions of dollars in fees predicated on the phony profits reported by Madoff's Ponzi scheme. Plaintiffs seek the recovery of those fees.

## PARTIES

### Plaintiffs

2. Plaintiffs invested assets in Fairfield Sentry and, due to the acts complained of herein, lost substantially all of their investment in the Fund, and have paid substantial investment advisory fees based on fictitious profits and for illusory services.

### Defendants

3. Defendant **Fairfield Greenwich Group ("FGG")** is the marketing name for defendant Fairfield Greenwich Limited ("FGL") and its member companies include defendants FGL, Fairfield Greenwich (Bermuda) Ltd. ("FGBL") and Fairfield Greenwich Advisors LLC ("FGA"). Upon information and belief, FGG operates as a *de facto* partnership of the other Fairfield entities and at least three principal partners, Walter Noel, Jeffrey Tucker, and Andres Piedrahita. Founded in 1983, FGG holds itself out as an alternative investment specialist. As of 2008, FGG claimed to have more than $14 billion employed in its various alternative asset management funds. FGG's principal office is in New York, New York.

4. Defendant **Fairfield Greenwich Limited ("FGL")** is an exempted company incorporated under the laws of the Cayman Islands and maintains offices in New York, New York. FGL is the Placement Agent for Fairfield Sentry and oversees the marketing of Fairfield Sentry's shares. FGL also previously served as the Investment Manager of the Fund. FGL is an affiliate of FGBL and is a member company of FGG.

5. Defendant **Fairfield Greenwich (Bermuda) Ltd. ("FGBL")** is a corporation organized under the laws of Bermuda on June 13, 2003. FGBL is the Investment Manager for Fairfield Sentry. FGBL is a wholly-owned subsidiary of FGL, and is a member company

of FGG. As Investment Manager for Fairfield Sentry, FGBL is responsible for: (i) the management of the Fund's investment activities; (ii) the selection of the Fund's investments; (iii) monitoring the Fund's investments; and (iv) maintaining the relationship between the Fund and its custodian, administrator, registrar and transfer agent. Effective April 20, 2006 FGBL registered with the SEC as an investment advisor under the Investment Advisers Act of 1940, as amended.

6.  Defendant **Fairfield Greenwich Advisors LLC ("FGA")** is a Delaware limited liability company, incorporated on December 12, 2001. FGA is an affiliate of FGG and FGBL and maintains its principal offices at 55 East 52nd Street, New York, New York. FGA provides Fairfield Sentry with administrative services and back-office support, and assists FGBL with its fund manager selection and due diligence process.

7.  Defendant **Fairfield Risk Services Ltd. ("FRS")** is incorporated under the laws of Bermuda. It is a wholly owned subsidiary of FGL and shares office space with FGBL. Along with FGBL, FRS serves on FGG's Risk Management team. FRS is responsible for analyzing and monitoring FGG's hedge fund managers, and maintaining a risk infrastructure to support these activities.

8.  Defendant **Walter Noel, Jr. ("Noel")** Noel is one of [FGG's] founding partners of FGG and is a director of Fairfield Sentry. As one of the Fund's directors, according to Fund offering documents, Noel "has overall management responsibility for the Fund, including establishing investment, dividend and distribution policy, and having the authority to select and replace the Fund's administrator, registrar and transfer agent, custodian, any officers of the Fund and other persons or entities with management or administrative responsibilities to the Fund. Noel is also one of the three main principals of

FGL and, since founding FGG, has served as the director or general partner of a number of its funds.

9. Defendant **Jeffrey H. Tucker** ("Tucker") is a Founding Partner of FGG, at which he oversees the business and operational activities of several management companies and funds. Tucker is a principal of FGBL. Upon information and belief, Tucker transacts business related to Fairfield Sentry in New York, New York.

10. Defendant **Andres Piedrahita** ("Piedrahita") is a Founding Partner of FGG and is also Director and President of FGBL, the Fund's Investment Manager. Upon information and belief, Piedrahita sought out customers for Fairfield Greenwich Group whose capital would then be invested with Bernard Madoff's investment vehicles in New York, New York. Upon information and belief, Piedrahita transacts business related to Fairfield Sentry in New York, New York.

11. Defendants FGG, FGL, FGBL, FGA, FRS, Noel, Tucker, and Piedrahita are collectively referred to herein as the "Fairfield Defendants."

## JURISDICTION AND VENUE

12. This Court has jurisdiction over the claims asserted herein pursuant to the Section 214 of the Investment Advisers Act and 28 U.S.C. § 1331.

13. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 1391(b) because substantial acts in furtherance of the alleged fraud and/or its effects have occurred in this District. Additionally, defendants maintain offices and conduct substantial business in this District.

## CLASS ACTION ALLEGATIONS

14. Plaintiffs bring this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of: all shareholders in Fairfield Sentry as of December 11, 2008, excluding defendants, all officers, directors, affiliates, agents, heirs, successors, assigns, immediate family members or legal representatives of defendants, BMIS, or Madoff, and any entity in which the defendants, BMIS, or Madoff have a controlling interest.

15. The Class is properly maintainable as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. The class is so numerous that joinder of all members is impracticable. While the precise number of Class members can only be ascertained through discovery, plaintiffs believe the proposed Class numbers in the hundreds, if not thousands of investors.

16. Plaintiffs' claims are typical of the claims of all Class members as all members of the Class were damaged by the same events, patterns of practice, and courses of conduct that give rise to the claims of the other members of the Class.

17. There are numerous questions of law and fact which are common to the Class and which predominate over any questions affecting individual members, including:

(i) Whether the federal securities laws were violated by, defendants acts as alleged herein;

(ii) Whether and to what extent plaintiffs and the Class were damaged by the Fairfield Defendants' wrongful conduct; and

(iii) Whether plaintiffs are entitled to rescission of all contractual relationships between plaintiffs and the Fairfield Defendants as well as a return of all fees paid by plaintiffs to the Fairfield Defendants based on fictitious profits.

18. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained experienced counsel qualified in class action litigation that is competent to assert the interests of the Class.

19. A class action is superior to other methods for the fair and efficient adjudication of this controversy involving thousands of similarly situated investors.

## SUBSTANTIVE ALLEGATIONS

20. Madoff founded Bernard L. Madoff Investment Securities LLC ("BMIS") in 1960, and eventually expanded the firm to a worldwide client base. As Madoff confessed shortly before his December 11, 2008 arrest, BMIS's business was in reality a giant Ponzi scheme whereby Madoff and BMIS fraudulently distributed new investors' assets to prior investors to create the illusion of profits. BMIS's account statements setting forth gains and securities holdings were fictitious. Upon information and belief, substantially all of the assets given to BMIS's investment advisor services for management have been stolen through this scheme.

21. Madoff's fraudulent scheme unraveled in early December 2008 when BMIS was unable to cover investors' redemption requests. According to a complaint filed against Madoff by the Securities and Exchange Commission ("SEC"), Madoff ultimately confessed to two senior BMIS employees that he was "finished," that he had "absolutely nothing," that "it's all just one big lie," and that the investment advisor services was "basically, a giant Ponzi scheme." Madoff explained to these senior employees that he had for years been paying returns to certain investors out of the principal received from other, different investors. Madoff stated that the business was insolvent, and that it had been for years. Madoff reportedly has estimated the losses from his fraud to be approximately $50 billion.

22. Despite the hundreds of millions of dollars in fees charged to Fairfield Sentry investors, and defendants' duties with respect to manager selection, due diligence and monitoring policies and practices, substantially all of the plaintiffs' and the Class' funds were stolen through the Madoff Ponzi scheme. These losses could have been avoided if defendants had fulfilled their duties the Class and if they had adequately investigated and monitored Madoff and BMIS. In failing to do so, defendants breached their duties to the Class, and effectively wiped out plaintiffs' investments. At the same time, defendants improperly collected hundreds of millions of dollars in fees predicated entirely on fictitious profits.

23. All investments in Fairfield Sentry were made pursuant to private placement memoranda which described the both the Fund's investment policies and defendants' obligations to Fund investors.

24. According to the Private Placement Memorandum dated August 14, 2006, Fairfield Sentry "seeks to obtain capital appreciation of its assets principally through the utilization of a non-traditional options trading strategy described as 'split strike conversion.'" This strategy was purportedly "implemented by [BMIS]" making BMIS the "execution agent of the split strike conversion strategy."

25. The PPM also provided that the Fund's assets would be in invested in legitimate securities, subject to strict Fund guidelines. For example, the PPM stated:

    a. "The Split Strike Conversion strategy is implemented by [BMIS], a broker-dealer registered with the Securities and Exchange Commission, through accounts maintained by the Fund at that firm. The accounts are subject to certain guidelines which, among other things, impose limitations on the minimum number of stocks in the basket, the minimum market capitalization of

the equities in the basket, the minimum correlation of the basket against the S&P 100 Index, and the permissible range of option strike prices. Subject to the guidelines, [BMIS] is authorized to determine the price and timing of stock and option transactions in the account . . . ."

26. The PPM also provided that "the Fund will observe the investment restrictions as set forth in the Fund's Articles of Association" which were summarized as follows:

   a. no more than 10% of the Net Asset Value of the Fund will be invested in the securities of any one issuer (other than any government of governmental agency)

   b. the Fund may not hold more than 10% of the issued securities of any one class of securities in any issuer (other than any government or governmental agency);

   c. no more than 10% of the gross assets of the Fund may be exposed to the creditworthiness or solvency of a single counterparty (other than any government or governmental agency), in each case calculated at the time of investment;

   d. no more than 10% of the Net Asset Value of the Fund may be invested in securities of countries where immediate repatriation rights are not available;

   e. the Fund will not invest in the securities of any issuer if the directors and officers of the Fund and the Investment Manager collectively own in excess of 5% of such securities;

   f. the Fund will not take or seek to take legal or management control of the issuer of underlying investments;

   g. the Fund will adhere to the general principle of diversification in respect of all of its assets;

   h. the Fund will not invest directly in real property;

   i. the Fund will not make any loans (except to the extent that the acquisition of any investment in securities or commodity interests described herein may constitute a loan) to any one issuer (other than any government or governmental agency) except with the consent of the custodian of the Fund's assets; and

   j. no more that [sic] 10% of the Net Asset Value of the Fund will be invested in physical commodities.

27. The PPM also required that that their assets in the Fund be safeguarded and held only by responsible, qualified entities.

    a. The PPM provided that "[a]ll proceeds from the sale of Shares will be received by the Fund in trust and will be deposited by the Fund into a segregated interest bearing account in the Fund's name at the Fund's Bank, Citco Bank Nederland N.V. Dublin Branch." (PPM, at 11.)

    b. In addition, the PPM stated that the Fund's custodian, Citco Bank Nederland N.V. Dublin Branch ("Citco Bank"), would "exercise reasonable skill, care and diligence in the selection of a suitable sub-custodian" for the Fund, and that Citco Bank "shall be responsible to the Fund for the duration of the sub-custody arrangement for satisfying itself as to the ongoing suitability of the sub-custodian to provide custodial services to the Fund." (Ex. 1, PPM, at 16.)

    c. Furthermore, the PPM stated that "Citco Bank will maintain an appropriate level of supervision over the sub-custodian(s) and make appropriate enquiries, periodically, to confirm that the obligations of the sub-custodian(s) continue to be competently discharged." (Id.)

28. The PPM further stated that care that would be taken in selecting and monitoring the Fund managers, the transparency to those managers, and in the oversight that would be maintained over the "split strike conversion strategy." For instance, the PPM stated:

    a. "FGBL's core product business model is the investment management and oversight of the split strike conversion strategy .... Working with one of its affiliates [FGA] ..., FGBL conducts a detailed manager selection and due

diligence process, analyzing such important issues as liquidity management, market and credit risks, management quality (which includes on-site visit(s), background, and reference checks), and operational, compliance, and regulatory risks." (PPM, Appendix A, Item 4.C.(7).)

b.   "FRS primarily conducts both the pre- and post-investment quantitative analyses of hedge fund managers, monitors the market risk and provides the quantitative analyses supporting the asset allocation decisions across the firm's multi-strategy funds. . . An important component of the FGG product platform is the position level transparency that we receive from all single managers which are included in our multi-strategy funds." (PPM, Appendix A, Items 4.A.(5) and 4.B.(8).)

29.   The PPM also referenced FGBL's Code of Ethics, and recognized that the purpose of the code was "to prevent fraud by reinforcing fiduciary principles that must govern the conduct of advisory firms and their personnel." (PPM, Appendix A, Item 9.E.) The Code, as set forth in the PPM, expressly requires that FGBL must act as a fiduciary to its clients, *i.e.*, Fairfield Sentry investors.

30.   The PPM further established the fee schedule by which FGL, FGBL, certain Directors, and Citco Fund Services would be compensated for their services:

a.   "Placement fees charged directly by FGL will not exceed 3%" (PPM, at 2, 8).

b.   "FGL will receive for a monthly management fee in an amount equal to one-twelfth of one percent (0.0833%) (approximately 1% per annum) of the Net Asset Value of the Fund before Performance Fees.... FGL may pay a portion of

the Management Fee to an affiliate of FGL and the Investment Manager...." (PPM, at 4, 15).

c. "FGL will pay the Investment Manager [FGBL] a fixed fee for providing certain managerial services to the Fund...." (PPM, at 4, 14).

d. "FGBL generally is paid by the Onshore Funds (i) an annual management fee of up to 1% of net assets, payable quarterly, and (ii) an incentive allocation of 20% of net profits...." (PPM, Appendix A, Items 1.D. and 2.G.).

e. "FGL will receive, for each calendar quarter, a performance fee (the "Performance Fee") . . . in an amount equal to 20% of the net realized and net unrealized appreciation in the Net Asset Value of each Share in such calendar quarter ("Net Profits")." (PPM, at 4, 15).

f. "Since the [performance] fee is calculated on a basis that includes unrealized appreciation of assets, such fee may be greater than if it were based solely on realized gains." (PPM, at 18).

31. The Fairfield Defendants further stated that, after selecting an investment manager, FGG would maintain "deep, ongoing joint venture relationships" with its Fund managers and would review for each Fund manager, on an ongoing basis:

a. "audited financials and auditor's management letter comments";

b. "accounting controls: from trade execution; to trade capture; to trade reconciliation with the Street, administrator, and fund; to fund's books and records";

c. "bank reconciliations for irregular or outstanding items"; and

    d. "broker reconciliations to ensure completeness and existence of all securities."

  32. Importantly, the Fairfield Defendants recognized that their skill and due diligence and monitoring procedures were essential to protecting Fund investors' assets from fraudulent conduct. For example, the Fairfield Defendants represented in their marketing materials that:

    a. FGG examines a manager's "operational risk," because "[o]perational failures, including misrepresentation of valuations and outright fraud, constitute a majority of instances where massive investor losses occur."

    b. The Fairfield Defendants advised Plaintiffs investors that a "key aspect" to transparency, and the ability to conduct adequate due diligence, was whether information was "provided by an independent third party - such as a broker dealer - or by the manager, where it might be subject to manipulation."

    c. The Fairfield Defendants also emphasized that, "[o]nly by receiving full transparency from its managers can FGG assure itself and its clients that every FGG fund continues to act according to the principles, agreements, and strategies that are specified to FGG and investors."

**Defendants Ignored Obvious "Red Flags" Indicating**
**That Madoff Was Operating a Ponzi Scheme**

  33. Long before Madoff's confession that his business was "basically a giant Ponzi scheme," and "just one big lie," there were numerous red flags and warning signs that were sufficient to alert defendants that Madoff's business was not legitimate.

  34. Two of the most glaring warning signs were:

- the fact that BMIS, despite claiming to oversee billions of dollars in assets, used a tiny, virtually unknown accounting firm with just three employees as its auditor; and

- the fact that Madoff's reported returns were "abnormally smooth," lacking the volatility normally associated with investments in the stock market.

35. Dozens of additional warning signs that should have alerted defendants – who purported to be seasoned investment professionals -- to Madoff's fraudulent scheme, were identified by Harry Markopolos, the certified financial analyst who for nine years tried to warn the SEC that Madoff was operating a Ponzi scheme.

36. In a written report to the SEC in November 2005, Markopolos identified twenty-nine "red flags" as warning signs of fraudulent activity; including:

(a) The fact that, it is "mathematically impossible for a strategy using index call options and index put options [as described by Madoff] to have such a low correlation to the market where its returns are supposedly generated from;"

(b) The fact that Madoff's reported option trading activity exceeded the trading volume of the entire options market. According to Markopolos, "there are not enough index option put contracts to hedge the way BM says he is hedging! And there is no way the OTC market is bigger than the exchange listed market for plain vanilla S&P 100 index put options;"

(c) The fact that "The counter-party credit exposures for UBS and Merrill Lynch would be too large for these credit departments to approve."

(d) "[S]ince Madoff owns a broker-dealer, he can generate whatever trade tickets he wants . . . . [H]ave the [feeder funds] matched [the trade tickets] to the time and sales of the exchanges? For example[,] if BM says he bot [sic] 1 million shares of GM, sold $1 million worth of OTC OEX calls and bot [sic] 1 million worth of OTC OEX puts . . . the GM prints would show on either the NYSE or some other exchange while the broker-dealers he

traded OTC options thru [sic] would show prints of the hedges they traded to be able to provide BM with the OTC options at the prices listed on BM's trade tickets;"

(e)   Madoff would only not permit outside performance audits. According to Markopolos, "[o]ne London based hedge fund . . . asked to send in a team of Big 4 accountants to conduct a performance audit during their planned due diligence. They were told 'No, only Madoff's brother-in-law who owns his own accounting firm is allowed to audit performance for reasons of secrecy in order to keep Madoff's proprietary trading strategy secret so that nobody can copy it;'"

(f)   Madoff was "suspected of being a fraud by some of the world's largest and most sophisticated financial services firms. Without naming names, here's an abbreviated tally:

(i)   "A managing director at Goldman Sachs prime brokerage operation told me that his firm doubts Bernie Madoff is legitimate so they don't deal with him;"

(ii)   "[Royal Bank of Canada] and [Société Générale] have removed Madoff some time ago from approved lists of individual managers;" and

(iii)   "Madoff was turned down . . . for a borrowing line from a Euro bank . . . . Now why would Madoff need to borrow more funds? . . . . Looks like he is stepping down the payout."

37.   In addition to the foregoing and other red flags that should have alerted any investment professional to question the bona fides of Madoff's business, Markopolos singled out FGG as a possible culpable participant in the Madoff's Ponzi scheme. For example, in his prepared remarks to Congress in connection with his testimony given on February 4, 2009, Markopolos cited April 2007 performance data from FGG as evidence of Madoff's Ponzi

scheme because it showed that he was "noticeably stepping down his stated returns." Markopolos explained:

> If you look closely at the [FGG] data, you will see that he went from double-digit returns from 1991-2000, but that all subsequent years returns were in single digits, a clear sign that he needed to cut back on the payouts to old investors in order to conserve cash and keep the scheme going.

38. Markopolos further noted that "red flags popped up everywhere" in Fairfield Sentry's financial statements for the years 2004, 2005 and 2006. Most notably, Markopolos pointed out that the Fund "used three different auditors over that three year period which is a major red flag," adding, "[t]his raised suspicions in my mind that Greenwich Sentry L.P. [sic] might be 'auditor shopping.'"

39. Markopolos went on to reiterate that:

> [the Fund's] financial statements themselves were nothing but a giant red flag to any investment professional looking at them because [Madoff] was in U.S. Treasury bills at year-end and there were no investment positions to mark to market. How convenient for a fraudster not to have any trading positions for an auditor to inspect. Since U.S. Treasury Bills exist in book-entry form only, how convenient not to have any physical securities on hand to inspect either.

40. Additionally, Markopolos testified that, despite being Madoff's largest feeder fund, with more than $7 billion invested with Madoff in 2007, FG's head of Risk Management "was not asking any of questions [sic] one would expect of a firm purporting to conduct due diligence."

41. During his congressional testimony, Markopolos was pointedly asked whether investigators should be going after Madoff feeder funds such as FGG "because they ripped off the American people," and Markopolos, who had figured out Madoff's fraudulent scheme using only publicly available information, replied, "I would say that they need to be looked into. If

they didn't know, they were willfully blind. And they got paid a lot of money to be willfully blind."

42.   Had defendants properly discharged their fiduciary duties to plaintiffs and the Class, they would not have invested the Fund's assets with Madoff and plaintiffs and other class members would not have suffered the losses complained of herein.

## COUNT I
### Rescission under the Investment Advisers Act, 15 U.S.C. § 80b-1 *et seq.*
### (Against Fairfield Defendants)

43.   Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

44.   The Fairfield Defendants acted as "investment advisers" to plaintiffs and the class pursuant to the Investment Advisers Act ("IAA").

45.   By executing individual subscriptions, fully incorporating the terms of the PPM, plaintiffs and the Fairfield Defendants executed "investment adviser agreements" under the IAA.

46.   As investment advisers, the Fairfield Defendants were responsible for serving Plaintiff's class in accordance with the statutory standards found in 15 U.S.C. § 80b-6(2). Specifically, the Fairfield Defendants were required not to "engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6(2).

47.   The Fairfield Defendants breached their duties to plaintiffs and the class by engaging in a course of conduct in which they recklessly engaged in acts, transactions, and business which allowed a fraud to be operated on plaintiffs and the class. The Fairfield Defendants breached their duties by, among other acts:

   a. Publishing and releasing materials to Plaintiffs that contained false and misleading descriptions of the manner in which Plaintiffs' assets were being invested and of the appreciation of Plaintiffs' assets;

   b. Failing to act with reasonable care in ascertaining that the information set forth in the written materials provided to Plaintiffs' were accurate and did not contain misleading statements or omissions of material facts;

   c. Failing to perform adequate due diligence, or to follow their own internal due diligence protocols, before selecting BMIS as the Fund's execution agent for its split-strike conversion method, and before allowing BMIS to serve as sub-custodian for the Fund;

   d. Investing Plaintiffs' assets in the Madoff Ponzi scheme with inadequate diligence or monitoring;

   e. Failing to monitor Madoff and BMIS on an ongoing basis to any reasonable degree, or to comply with their own internal protocols for monitoring the assets entrusted to Madoff and BMIS;

   f. Failing to take adequate steps to confirm BMIS's purported account statements, transactions and holdings of Fund assets; and

   g. Profiting at the expense of Plaintiffs and the Class.

  48. The Fairfield Defendants are liable as direct participants in the wrongs listed above. The purpose of the Fairfield Defendants' conduct was to enrich themselves at the expense of plaintiffs and the Class. The aforementioned conduct by the Fairfield Defendants was so reckless as to constitute a deceit and/or fraud upon Plaintiffs.

49. Plaintiffs have been damaged as a result of the Fairfield Defendants' breach of their duties under the IAA.

50. As a result, Plaintiffs are entitled to rescission of their investment adviser agreements with the Fairfield Defendants and to recover all fees and commissions paid in connection to Plaintiffs' investments in the Fund.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

## PRAYER

WHEREFORE, Plaintiffs request the following:

a) Certification of this class action as proper and maintainable pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaration of the proposed named Plaintiffs as a proper Class representatives;

b) Compensatory, consequential, and general damages in an amount to be determined at trial;

c) Disgorgement and restitution of all earnings, profits, compensation and benefits received by Defendants as a result of their unlawful acts and practices;

d) Rescission of all contractual relationships between Plaintiffs and Defendants and a return of all principal payments made and fees paid by Plaintiffs to Defendants;

e) Reasonable attorneys' fees; and

f) Such other and further relief as this Court may deem just and proper.

Dated: March 10, 2009

                            Respectfully submitted,

                            COHEN MILSTEIN SELLERS
                                & TOLL PLLC

                            By: _/s/ Catherine Torell_
                                Catherine A. Torell (CT-0905)
                            150 East 52nd Street
                            Thirtieth Floor
                            New York, New York  10022
                            Telephone: 212-838-7797
                            Facsimile: 212-838-7745
                            ctorell@cohenmilstein.com

                            Steven J. Toll
                            Daniel S. Sommers
                            Joshua S. Devore
                            COHEN MILSTEIN SELLERS
                              & TOLL PLLC
                            1100 New York Avenue, N.W.
                            West Tower, Suite 500
                            Washington, DC  20005-3964
                            Telephone: 202-408-4600
                            Facsimile: 202-408-4699
                            stoll@cohenmilstein.com
                            dsommers@cohenmilstein.com
                            jdevore@cohenmilstein.com

                            *Counsel for Plaintiffs*